**UNITED STATES DISTRICT COURT FOR**
**THE NORTHERN DISTRICT OF ILLINOIS**

**AYANNA A. LYNN,**

Plaintiff,

v. **Case No.: _______________**

**FORD MOTOR COMPANY,**

Defendant.

## COMPLAINT AND JURY DEMAND

## INTRODUCTION

Plaintiff Ayanna A. Lynn brings this action against Defendant Ford Motor Company for sex discrimination, sexual harassment, quid pro quo harassment, retaliation, disability discrimination, failure to accommodate, interference with disability rights, defamation, violation of the Illinois Whistleblower Act, retaliatory discharge in violation of Illinois public policy, negligent supervision, and negligent retention arising out of her employment at Ford's Chicago Assembly Plant from April 2024 through her unlawful termination on September 8, 2025.

Despite Plaintiff's strong performance as a Quality Engineer, Defendant subjected her to pervasive and unwelcome sexual advances from multiple supervisors, denied her the protections afforded under federal anti-discrimination laws when she reported the harassment, retaliated against her through escalating hostility and fabricated performance issues, discriminated against her based on disability, defamed her character through false and malicious statements, and negligently supervised and retained supervisors with known propensities for sexual harassment and retaliation—culminating in her wrongful termination.

Publicly available information confirms that Ford Motor Company has long been on notice that its Chicago-area production facilities have been plagued by systemic sexual harassment and hostile work environments, particularly for women and Black employees. As early as the mid-1990s, female employees at Ford's Chicago Assembly Plant and Chicago Stamping Plant brought class claims and EEOC charges alleging widespread, routine sexual harassment, including groping, coerced sex, sexually explicit comments, pornography in the workplace, and retaliation against those who complained. Despite litigation and agency investigations, reports in subsequent years describe the same kinds of misconduct recurring inside the Chicago plants.

In 2017, the U.S. Equal Employment Opportunity Commission announced that it had found reasonable cause to believe that female and Black employees at Ford's Chicago assembly and stamping facilities were subjected to racial and sexual harassment, and that Ford failed to take effective corrective action. Ford agreed to pay up to $10.125 million to resolve the EEOC's harassment investigation at the two Chicago plants and to implement remedial measures such as anti-harassment training, reporting to the EEOC, and the use of an outside monitor. Around the same time, media accounts described a "culture of harassment" at the Chicago plants, including crude sexual comments, pornographic graffiti, unwanted touching, sexual propositions linked to job assignments, and retaliation against workers who objected.

Even after the 2017 EEOC settlement and Ford's public promises to reform its workplace culture, women at the Chicago Assembly Plant continued to file lawsuits alleging that Ford condoned and perpetuated a sexually hostile environment at the facility. These lawsuits and investigative reports allege that Ford is a "recidivist offender" that has repeatedly failed to eradicate known harassment at its Chicago plants and has allowed

supervisors, managers, and union officials to use their authority to coerce sex, trade favorable assignments for sexual compliance, and punish those who refused or reported misconduct. Ford's own CEO publicly acknowledged the "gut-wrenching" accounts of harassment at the Chicago facilities and visited the plants in 2018 in response to mounting criticism, further confirming Ford's awareness of these entrenched problems.

Against this backdrop, the sexual harassment, hostile work environment, and retaliation that Plaintiff experienced at Ford's Chicago plant were not isolated incidents or the product of a few rogue employees. Instead, they occurred in the context of a longstanding pattern and practice of sex-based harassment and tolerance of such misconduct at Ford's Chicago manufacturing facilities—a pattern that Ford has known about for decades and has failed to remedy. Ford acted with reckless disregard in light of prior EEOC findings and settlements.

Defendant's actions violated Title VII of the Civil Rights Act of 1964, as amended, the Americans with Disabilities Act of 1990, as amended, the Illinois Whistleblower Act, 740 ILCS 174/1 *et seq.*, Section 1981, and clearly established public policy of the State of Illinois. Plaintiff brings this action to obtain compensation and other relief for the significant harm caused by Defendant's unlawful conduct.

## I. JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under federal law, including Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 *et seq.*

2. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

3. Venue is proper in this District under 28 U.S.C. § 1391 because the events giving rise to this action occurred in this District and Defendant conducts substantial business here.

## II. PARTIES

4. Plaintiff Ayanna A. Lynn is an African-American woman, born August 27, 1993, and a resident of Lansing, Illinois.

5. Plaintiff was employed by Ford Motor Company as a Quality Engineer (Engineering Specialist) at the Chicago Assembly Plant from April 2024 until her unlawful termination on September 8, 2025.

6. Defendant Ford Motor Company is a Delaware corporation authorized to do business in Illinois, with its Chicago Assembly Plant located at 12600 S. Torrence Avenue, Chicago, Illinois 60633.

7. At all relevant times, Defendant employed more than fifteen employees and was an employer covered by Title VII of the Civil Rights Act of 1964, as amended, and the Americans with Disabilities Act of 1990, as amended.

## III. EXHAUSTION OF ADMINISTRATIVE REMEDIES

8. Plaintiff timely filed Charge of Discrimination No. 440-2025-09286 with the Equal Employment Opportunity Commission ("EEOC") on December 18, 2025, asserting discrimination and harassment based on sex (female), disability, and retaliation, dual-filed with the Illinois Department of Human Rights.

9. The EEOC investigated Plaintiff's charge and issued a Determination and Notice of Rights on December 22, 2025, dismissing the charge and providing Plaintiff with notice of her right to sue.
10. Plaintiff received the EEOC's Determination and Notice of Rights on or about December 22, 2025, and files this action within ninety days of receipt of that Notice.
11. Plaintiff has exhausted her administrative remedies by filing her Charge of Discrimination with the EEOC within 300 days of the acts complained of and by filing this lawsuit within ninety days of receiving the Notice of Rights.

## IV. FACTUAL ALLEGATIONS

### A. Plaintiff's Career at Ford

12. Plaintiff began employment with Ford Motor Company at the Chicago Assembly Plant in or around April 2024 in the position of Engineering Specialist (Quality Engineer).
13. Plaintiff held an engineering degree and brought significant technical expertise to her role.
14. During her employment, Plaintiff consistently performed her job duties at a high level and received positive feedback for her work, including praise for training new hires and completing major Kaizen projects.
15. Plaintiff had never been placed on a performance improvement plan or received any formal discipline prior to the events described herein.
16. Plaintiff reported to Process Engineering Manager Domanique Rawls and worked closely with Quality Manager Sunil Archante and Final Area Manager Tracy Carter.

### B. Sexual Harassment by Quality Manager Sunil Archante

17. In December 2024, Quality Manager Sunil Archante began making unwelcome sexual advances toward Plaintiff.
18. On or about December 12, 2024, Sunil sent Plaintiff a text message stating: "I wish I can lay underneath you." This was in response to a text message of Lynn informing him that she was out sick for the day.
19. Plaintiff had never been in a romantic or sexual relationship with Sunil and had declined his advances on multiple prior occasions.
20. Plaintiff was shocked, offended, and disturbed by Sunil's sexually explicit text message.
21. On or about December 13, 2024, Plaintiff immediately reported Sunil's sexual harassment to her direct supervisor, Domanique Rawls, and expressed that she did not feel comfortable being around Sunil.
22. Rather than taking prompt remedial action, Domanique Rawls laughed off Plaintiff's complaint and failed to address the harassment.
23. On or about December 17, 2024, Plaintiff escalated her complaint to Final Area Manager Tracy Carter, reporting that she was being taken advantage of and that Sunil had sexually harassed her in his office.
24. Tracy Carter similarly dismissed Plaintiff's complaint, laughed it off, and failed to take any corrective action.
25. Ford's failure to respond to Plaintiff's sexual harassment complaints emboldened her supervisors to continue subjecting her to sex-based mistreatment.

**C. Sexual Harassment and Unwelcome Advances by Manager Domanique Rawls**

26. Beginning in or around January 2025, Plaintiff's direct supervisor Domanique Rawls began making unwelcome personal and romantic advances toward Plaintiff.

27. Domanique approached Plaintiff sexually, revealing that she was attracted to women and expressing romantic interest in Plaintiff.

28. Plaintiff informed Domanique that she liked men, was in a relationship with a man, and was not interested in a romantic relationship with Domanique.

29. Despite Plaintiff's clear rejection, Domanique persisted in making inappropriate personal overtures, including engaging in multiple phone conversations in which she discussed her desire "to be loved and be in a relationship."

30. In mid-February 2025, Domanique asked Plaintiff to watch her young son while she traveled to Kentucky to move belongings out of her house—a personal favor crossing professional boundaries.

31. Plaintiff politely declined, stating she did not feel comfortable watching Domanique's son.

32. Domanique became visibly upset, responded with hostility, and hung up the phone on Plaintiff.

33. In mid-February 2025, Domanique asked Plaintiff to accompany her to a Wendy's restaurant on a Saturday to serve as a witness and sign documents related to the sale of Domanique's house in Kentucky.

34. Plaintiff felt uncomfortable but agreed to avoid further conflict; Homer Henderson also served as a witness.

35. On March 20, 2025, Domanique sent Plaintiff a text message stating she knew Plaintiff did not like when Domanique "got personal" with her—acknowledging that

Plaintiff had repeatedly communicated discomfort with Domanique's boundary-crossing behavior.

36. On March 28, 2025, Domanique confronted Plaintiff with jealousy and suspicion, accusing Plaintiff of being in a relationship with Sunil because they wore similar eyeglasses—demonstrating possessive and intrusive conduct.

37. On April 20, 2025, Domanique initiated conversations with Plaintiff about going to the gym together and sharing weight loss goals, commenting "damn your goals are high" when reviewing Plaintiff's fitness targets.

38. On April 26, 2025, Domanique sent Plaintiff unsolicited personal photographs of her manicured nails, further blurring professional boundaries.

39. On April 30, 2025, Domanique asked Plaintiff if she had left food for her, continuing a pattern of treating Plaintiff as though they were in a personal relationship.

40. Throughout this period, Plaintiff was also required to perform personal errands for her supervisors, including driving approximately 25 minutes to Schererville, Indiana on multiple occasions to pick up lunch orders for Tracy Carter and being asked to provide food for Domanique.

41. Plaintiff reasonably perceived these demands as sex-based exploitation tied to her rejection of unwanted sexual advances.

**D. Quid Pro Quo Harassment and Escalating Retaliation**

42. On February 14, 2025, shortly after Plaintiff rejected Domanique's romantic advances and declined personal favors, Plaintiff began experiencing retaliation.

43. Domanique authored a contradictory and negative performance review of Plaintiff—a marked departure from prior positive feedback.

44. Plaintiff sent Tracy Carter a text message documenting Domanique's contradictory statements in the performance review, expressing concern about the unfair characterization.

45. In May 2025, Ford held a Kaizen event (continuous improvement competition) at the Chicago Assembly Plant, attended by corporate leadership including Bryce Currie, Vice President of Manufacturing.

46. Plaintiff and Domanique were both assigned to lead competing Kaizen projects—a conflict of interest given that Domanique was Plaintiff's direct supervisor and held power over her performance evaluations and career advancement.

47. Domanique actively sabotaged Plaintiff's project by refusing to allow Plaintiff to work additional hours necessary to complete her project successfully, while Domanique herself stayed late and dedicated extra time to her own competing project.

48. Domanique won the Kaizen competition as a result of this unequal treatment.

49. Despite the disadvantage, Plaintiff's Kaizen work was recognized by senior leadership; Daryl Sykes, Director of Manufacturing, posted multiple photographs of Plaintiff on his LinkedIn account, praising the Kaizen event.

50. This did not help the work culture.

51. Domanique’s action towards the Plaintiff got worse.

52. Plaintiff promptly reported Domanique's retaliatory threat to Tracy Carter and to Human Resources, stating that she no longer felt comfortable having one-on-one meetings with Domanique.

53. On May 7, 2025, Domanique acknowledged in writing that Plaintiff was "training Aidan [a new hire] very well"—contemporaneous praise directly contradicting later fabricated claims of declining performance and bad behavior.

**E. Protected Complaints and Ford's Failure to Act**

54. On June 3, 2025, Domanique walked into Plaintiff's work area and yelled at Demetrio disrespectfully in front of other employees, including Debbie Courtsee, who sits directly across from Plaintiff's desk.

55. Plaintiff sent an email to Domanique requesting that Domanique not speak to her in a disrespectful manner. Domanique responded and copied Labor Relations Manager Tiffani Orange on the thread.

56. On June 4, 2025, Tiffani Orange initially responded agreeing that issues should be worked through Tracy Carter to solve within the team.

57. Later the same day, Tiffani Orange reversed her position and stated she would conduct a joint one-on-one meeting with Plaintiff and Domanique together—raising Plaintiff's suspicion that Tiffani and Domanique were in a personal relationship and that Tiffani was protecting Domanique rather than investigating Plaintiff's complaints impartially.

58. On June 11, 2025, Plaintiff submitted a formal complaint through Ford's QR code system reporting retaliation by Domanique Rawls.

59. The QR code reporting portal explicitly stated that it was appropriate for reporting retaliation and workplace misconduct.

60. On the same day, June 11, 2025, Tiffani Orange summoned Plaintiff to her office and told Plaintiff that the QR code system was "not for retaliation" and that Plaintiff should not have filed the complaint.

61. Plaintiff messaged Tiffani Orange via Microsoft Teams with a screenshot showing that the QR code portal explicitly listed retaliation as a covered category, asking whether the posted notice should be changed if retaliation complaints were not accepted.

62. Tiffani Orange did not respond to Plaintiff's message and took no corrective action regarding Domanique's conduct.

63. Tiffani Orange's dismissal of Plaintiff's retaliation complaint and her instruction that Plaintiff not use the company's reporting system effectively discouraged Plaintiff from reporting further misconduct and signaled that Ford would not protect employees who complained of harassment and retaliation.

64. At the end of June 2025, Plaintiff escalated her concerns to Tracy Carter, informing him that she suspected Tiffani Orange and Domanique Rawls were working together to retaliate against her and that she was not receiving support.

65. Tracy Carter directed Plaintiff to meet with Labor Relations Area Manager Staci Washington.

66. Staci Washington told Plaintiff that her "record was clean" and that there was "an open investigation," but provided no further information, no timeline, and no assurance of protection from ongoing retaliation.

67. On July 18, 2025, Plaintiff sent an email to HR representative Dawn Gilmore explicitly stating that she did not feel comfortable having one-on-one meetings with Domanique due to the ongoing harassment, retaliation, and complaints she had filed.

68. Plaintiff received no response from Dawn Gilmore or any other HR representative.

69. On July 21, 2025, Plaintiff filed a formal written complaint with Adrian, an investigator for the Chicago Assembly Plant, detailing Domanique's disrespectful

and rude conduct toward her and providing the names of multiple witnesses, including Costed Foy, Debbie Courtsee, Osama Bureem, and Dan Lacy.

70. On July 29, 2025, Plaintiff filed a second formal complaint with Adrian regarding ongoing harassment and bullying by Domanique Rawls.

71. Despite Plaintiff's repeated, documented complaints through multiple channels—verbal reports, emails, QR code system, and formal HR complaints—Ford took no effective remedial action to stop the harassment or retaliation or to separate Plaintiff from her harassing supervisor.

**F. Denial of Transfer Requests and Fabricated Performance Issues**

72. Beginning in early July 2025, Plaintiff sought to escape the hostile and retaliatory work environment by applying for multiple transfer positions within Ford, including an Engineering Specialist position under the supervision of Nick Tweichs, a manager Plaintiff had previously worked for successfully.

73. Domanique Rawls blocked Plaintiff from interviewing for any transfer positions, falsely claiming that Plaintiff's "performance was declining" and that Plaintiff exhibited "bad behavior."

74. Plaintiff had never received any written warnings, formal corrective action, or documentation of performance deficiencies or behavioral issues.

75. The allegations of declining performance and bad behavior were fabricated in retaliation for Plaintiff's rejection of sexual advances and her protected complaints of harassment.

76. Domanique's false claims were belied by contemporaneous evidence, including:

- Domanique's May 7, 2025 written acknowledgment that Plaintiff was training new employees "very well";

- Plaintiff's successful completion of a major Kaizen project that received corporate recognition;
- Plaintiff's role as the primary presenter at Vehicle Quality Review (VQR) meetings, a responsibility given to high-performing engineers;
- The absence of any prior disciplinary history, performance improvement plans, or negative evaluations during Plaintiff's tenure.

77. Domanique's fabricated performance claims were designed to trap Plaintiff in a hostile work environment under Domanique's supervision and to punish Plaintiff for refusing Domanique's romantic advances and reporting misconduct.

**G. Conspiracy and Collusion Among Ford Leadership**

78. In mid-August 2025, Jennifer Mayfield, Trim Manager and close personal friend of Domanique Rawls, falsely accused Plaintiff of exhibiting "bad behavior" in a meeting.

79. Jennifer Mayfield and Plaintiff had recently conducted a one-on-one meeting in which Jennifer spoke highly of Plaintiff and praised her work; Plaintiff memorialized that positive conversation in a follow-up email copied to Domanique.

80. Jennifer Mayfield's subsequent false accusation of bad behavior was part of a coordinated effort with Domanique to build a pretextual record justifying Plaintiff's termination.

81. On August 19, 2025, Plaintiff met with Calvin Washington, an MP&L Area Manager who had previously served as Plaintiff's mentor, seeking career advice in his office. Due to the ongoing harassment, Plaintiff requested that his door stay open during their meeting.

82. Calvin Washington yelled at Plaintiff and told her she was going to "get walked out" of the plant—information Calvin had received from his wife, Staci Washington, who worked in Labor Relations and had access to confidential HR information about Plaintiff's complaints and Ford's plans.

83. Calvin's disclosure revealed that Labor Relations, rather than investigating Plaintiff's harassment complaints, was coordinating with Domanique and management to terminate Plaintiff.

84. Rumors were deliberately spread within the plant that Plaintiff was "dating Calvin Washington" and engaging in inappropriate relationships with hourly employees, despite the fact that Plaintiff had properly disclosed her relationship with an hourly repair worker to Ford Corporate and received written confirmation that the relationship was not a conflict of interest because they did not report to each other and worked in entirely different departments.

85. On August 21, 2025, Domanique removed Plaintiff from the "Chassis" work group text thread in retaliation for Plaintiff complimenting another leader (Dan Lacy) on his work—Domanique was angered that Plaintiff praised someone other than Domanique and used her supervisory authority to exclude and isolate Plaintiff.

86. Plaintiff emailed Tracy Carter documenting this retaliatory exclusion, as Tracy was the manager overseeing the Chassis area.

87. On August 21, 2025, Plaintiff escalated her ongoing harassment and retaliation concerns directly to Quality Manager Sunil Archante (the original harasser) and Assistant Plant Manager Nicole Schrozez.

88. Neither Sunil nor Nicole responded or took any corrective action.

**H. False Accusations, Suspension, and Termination**

89. On August 21, 2025 at approximately 3:30 p.m., Plaintiff was summoned to the Human Resources office and informed that she was being suspended with pay, effective immediately.

90. Ford claimed that Domanique Rawls had accused Plaintiff of threatening her during a one-on-one meeting in Conference Room 103.

91. Plaintiff did not threaten Domanique Rawls.

92. Plaintiff provided HR with a detailed written statement describing the actual conversation that took place in Conference Room 103, denying any threat.

93. Ford conducted no meaningful investigation of the threat allegation, interviewed no witnesses, and credited Domanique's false accusation without corroboration.

94. The false threat allegation was fabricated by Domanique as the final step in a coordinated plan to terminate Plaintiff after Plaintiff refused sexual advances and filed multiple harassment and retaliation complaints.

95. On September 8, 2025, Ford Motor Company terminated Plaintiff's employment.

96. Ford's stated reasons for termination—performance issues, bad behavior, and threatening conduct—were pretextual and unsupported by any credible evidence.

97. The true reasons for Plaintiff's termination were her sex (female), her rejection of unwanted sexual advances from supervisors Sunil Archante and Domanique Rawls, her disability (anxiety disorder), and her protected complaints of harassment, discrimination, and retaliation.

**I. Disability Discrimination and Failure to Accommodate**

98. As a direct result of the severe and unrelenting sexual harassment, retaliation, and hostile work environment, Plaintiff began experiencing significant psychological and physical symptoms in early 2025.

99. Plaintiff developed an anxiety disorder that substantially limited major life activities, including sleeping, concentrating, interacting with others, and the operation of neurological and brain functions.

100. On February 13, 2025, Plaintiff sought medical treatment at Midwest Express Clinic and was diagnosed with anxiety disorder.

101. Plaintiff was prescribed Lexapro (escitalopram) 10 mg and hydroxyzine HCl 10 mg to manage her anxiety symptoms.

102. Plaintiff underwent standardized assessments including the Patient Health Questionnaire (PHQ-9) and Generalized Anxiety Disorder-7 (GAD-7), which documented clinically significant symptoms.

103. On July 3, 2025, Plaintiff returned to Midwest Express Clinic for medication refills and ongoing treatment of her anxiety disorder, which remained active and required continued pharmaceutical management.

104. Plaintiff's medical records document diagnoses of anxiety disorder, weight loss from 163 pounds in February 2025 to 129 pounds by July 2025, and functional impairments caused by work-related stress.

105. Plaintiff notified Ford of her disability and requested reasonable accommodations, including relief from the hostile work environment, transfer away from her harassing supervisor, and modified work conditions to reduce stress.

106. Ford denied Plaintiff's accommodation requests and instead escalated discipline and retaliation, forcing Plaintiff to continue working under Domanique Rawls' supervision despite documented medical need for separation.

107. Ford regarded Plaintiff as disabled based on her anxiety disorder, medical treatment, weight loss, and need for accommodations.

108. Ford discriminated against Plaintiff because of her actual and perceived disability by subjecting her to heightened scrutiny, fabricated performance allegations, denial of transfers, and ultimate termination.

109. Ford failed to engage in the interactive process required by the ADA and failed to provide reasonable accommodations that would have allowed Plaintiff to continue performing the essential functions of her position.

110. Ford terminated Plaintiff in retaliation for disclosing her disability and requesting accommodations.

**J. Defamation and Damage to Reputation**

111. In or around June 2025 and continuing through Plaintiff's termination, Ford supervisors and HR personnel, including Domanique Rawls, Tiffani Orange, Jennifer Mayfield, Calvin Washington, and Staci Washington, made false statements of fact about Plaintiff to other Ford employees and management.

112. These false statements included:

- That Plaintiff was engaged in inappropriate romantic or sexual relationships with hourly employees, including Calvin Washington and Sunil Archante;
- That Plaintiff exhibited "bad behavior" and "declining performance" despite documented evidence to the contrary;
- That Plaintiff threatened violence against Domanique Rawls;
- That Plaintiff violated workplace policies and engaged in misconduct warranting suspension and termination.

113. Each of these statements was false.

114. Domanique, Tiffani, Jennifer, Calvin, Staci, and other Ford managers and HR personnel knew these statements were false or acted with reckless disregard for the truth when making them.

115. These false statements were made to third parties within Ford, including HR investigators, plant management, and other employees.

116. The false statements were not subject to any privilege, or any applicable privilege was exceeded by malice and abuse.

117. The false statements were made with actual malice, defined as knowledge of falsity or reckless disregard for the truth, for the purpose of fabricating grounds to terminate Plaintiff and cover up Ford's failure to address sexual harassment.

118. Ford published these false statements with the intent to harm Plaintiff's professional reputation and justify unlawful employment actions.

119. As a direct and proximate result of these defamatory statements, Plaintiff has suffered and continues to suffer:

- Damage to her professional reputation in the automotive engineering industry;
- Difficulty obtaining subsequent employment due to the false record created by Ford;
- Severe emotional distress, humiliation, and mental anguish;
- Loss of professional relationships and networking opportunities;
- Harm to her standing in the engineering community.

120. Ford is vicariously liable for the defamatory statements made by its supervisory employees acting within the scope of their employment and in furtherance of Ford's interest in justifying Plaintiff's termination.

121. Ford ratified the defamatory conduct by its agents and employees by failing to investigate, correct, or retract the false statements and by relying on those false statements as grounds for Plaintiff's termination.

**K. Corporate Knowledge of Supervisory Misconduct and Dangerous Propensities**

122. Prior to and during Plaintiff's employment, Ford had actual or constructive knowledge of Domanique Rawls' propensity for sexual harassment, retaliation, and abuse of supervisory authority through multiple sources.

123. On information and belief, Domanique Rawls had been the subject of prior complaints from other employees regarding inappropriate conduct, boundary violations, and retaliation against employees who rejected her personal advances or reported her misconduct.

124. Ford's Labor Relations department, including Tiffani Orange and Staci Washington, received multiple reports about Domanique Rawls' conduct from various employees but failed to take corrective action or discipline her.

125. Ford's management, including Tracy Carter and Nicole Schrozez, observed or were informed of Domanique Rawls' pattern of favoritism, personal boundary violations with subordinates, jealous and possessive behavior toward employees she supervised, and retaliation against employees who reported misconduct.

126. Ford's investigation into Plaintiff's complaints revealed a pattern of retaliatory conduct by Domanique Rawls toward multiple employees, including explicit threats to terminate employees, exclusion of employees from work communications, fabrication of performance issues, and blocking of transfer opportunities.

127. Despite this knowledge, Ford failed to discipline Domanique Rawls, failed to remove her from supervisory responsibilities, and continued to place employees—

including Plaintiff—under her direct supervision, thereby creating a foreseeable risk of harm.

128. Ford knew or should have known that Sunil Archante had a propensity for making inappropriate sexual advances toward female subordinates based on his December 2024 sexually explicit text message to Plaintiff and his pattern of dismissing complaints when reported to management.

129. Tiffani Orange's dismissal of Plaintiff's June 11, 2025 retaliation complaint and her instruction that Plaintiff not use Ford's formal reporting system demonstrated Ford's deliberate indifference to supervisory misconduct and its failure to implement or enforce policies designed to prevent harassment and retaliation.

130. Ford's pattern of protecting Domanique Rawls despite documented complaints, its failure to investigate Plaintiff's harassment allegations promptly or thoroughly, and its coordination with Domanique to build a pretextual termination case against Plaintiff demonstrated ratification of supervisory misconduct at the highest levels of plant management.

131. As a direct and proximate result of Ford's knowledge of and deliberate indifference to its supervisors' dangerous propensities, Plaintiff suffered sexual harassment, retaliation, disability discrimination, defamation, and wrongful termination.

**L. Damages**

132. As a direct and proximate result of Ford's unlawful conduct, Plaintiff has suffered and continues to suffer severe economic and non-economic damages, including:

- Lost wages, salary, bonuses, and employment benefits from the date of termination through the present and continuing into the future;
- Loss of pension accrual, retirement benefits, and stock options;
- Loss of career advancement opportunities and professional development;
- Severe emotional distress, mental anguish, anxiety, depression, and psychological injury requiring ongoing medical treatment and therapy;
- Physical manifestations of emotional distress, including significant weight loss (34 pounds), insomnia, hair loss, gastrointestinal distress, and other somatic symptoms;
- Humiliation, embarrassment, loss of dignity, and damage to professional reputation;
- Past and future medical expenses for psychiatric treatment, counseling, and medication;
- Loss of enjoyment of life and diminished quality of life;
- Costs and attorneys' fees incurred in pursuing this action.

## V. CAUSES OF ACTION

### COUNT I — TITLE VII & 1981 HOSTILE WORK ENVIRONMENT BASED ON SEX (Against Ford Motor Company)

133. Plaintiff incorporates all preceding paragraphs by reference.

134. Plaintiff is a member of a protected class under Title VII (female).

135. Plaintiff was subjected to unwelcome harassment based on sex, including:

- Sexually explicit text message from Quality Manager Sunil Archante stating "I wish I can lay underneath you";
- Repeated unwelcome romantic and sexual advances from supervisor Domanique Rawls;

- Requests to perform personal errands and favors for male and female supervisors tied to rejection of sexual advances;
- Jealous and possessive behavior by Domanique Rawls following Plaintiff's rejection;
- Persistent boundary-crossing personal communications and demands;
- Sex-based exploitation requiring Plaintiff to fetch lunches and provide personal services not required of male engineers.

136. The harassment was severe and pervasive, creating an objectively hostile and abusive work environment that altered the terms and conditions of Plaintiff's employment.

137. Plaintiff promptly reported the harassment to her supervisor Domanique Rawls, to Final Area Manager Tracy Carter, to Labor Relations Manager Tiffani Orange, to HR representatives, and through Ford's formal complaint system.

138. Ford had actual knowledge of the harassment through Plaintiff's multiple reports and complaints.

139. Ford failed to take prompt and effective remedial action to stop the harassment or protect Plaintiff from retaliation.

140. The harassment was perpetrated by supervisors with authority over Plaintiff's work assignments, performance evaluations, and employment status, rendering Ford strictly liable under Title VII & Section 1981.

141. Ford's constructive knowledge of the harassment and its failure to take corrective action render Ford liable under Title VII and Section 1981.

142. As a direct and proximate result of Ford's unlawful conduct, Plaintiff has suffered and continues to suffer severe economic damages, including lost wages,

lost employment benefits, lost career opportunities, and diminished earning capacity.

143. As a direct and proximate result of Ford's unlawful conduct, Plaintiff has suffered and continues to suffer severe non-economic damages, including extreme emotional distress, mental anguish, anxiety disorder requiring ongoing medication and treatment, significant weight loss and physical deterioration, insomnia, humiliation, embarrassment, loss of dignity, damage to professional reputation, and loss of enjoyment of life. Plaintiff's emotional and psychological injuries are severe, disabling, and long-lasting, requiring continued psychiatric care and therapy.

144. Plaintiff seeks compensatory damages for economic losses and emotional distress, declaratory relief, injunctive relief, back pay, front pay, reinstatement or front pay in lieu of reinstatement, pre-judgment and post-judgment interest, and reasonable attorneys' fees and costs.

**COUNT II — TITLE VII QUID PRO QUO SEXUAL HARASSMENT (Against Ford Motor Company)**

145. Plaintiff incorporates all preceding paragraphs by reference.

146. Plaintiff's direct supervisor Domanique Rawls made unwelcome sexual and romantic advances toward Plaintiff beginning in January 2025.

147. Plaintiff clearly and repeatedly rejected Domanique's advances.

148. Following Plaintiff's rejections, Domanique subjected Plaintiff to adverse employment actions, including:

- Negative and contradictory performance review in February 2025;
- Sabotage of Plaintiff's Kaizen project by denying work hours while favoring her own competing project;

- Explicit threats to get Plaintiff fired in retaliation;
- Blocking Plaintiff's applications for transfer positions;
- Fabricating false claims of declining performance and bad behavior to trap Plaintiff under Domanique's supervision;
- Coordinating with Labor Relations and other managers to build a pretextual termination case;
- Filing a false complaint that Plaintiff threatened violence;
- Causing Plaintiff's suspension and ultimate termination.

149. The adverse employment actions were tangible employment actions including denial of transfers (constructive demotion), suspension, and termination.

150. The adverse employment actions were directly caused by Plaintiff's rejection of her supervisor's sexual advances and constituted quid pro quo sexual harassment.

151. As a supervisory employee with authority to make or recommend employment decisions affecting Plaintiff, Domanique Rawls' quid pro quo harassment renders Ford strictly liable under Title VII.

152. As a direct and proximate result of Ford's unlawful conduct, Plaintiff has suffered and continues to suffer severe economic damages, including lost wages, lost employment benefits, lost career opportunities, and diminished earning capacity.

153. As a direct and proximate result of Ford's unlawful conduct, Plaintiff has suffered and continues to suffer severe non-economic damages, including extreme emotional distress, mental anguish, anxiety disorder requiring ongoing medication and treatment, significant weight loss and physical deterioration, insomnia, humiliation, embarrassment, loss of dignity, damage to professional reputation, and

loss of enjoyment of life. Plaintiff's emotional and psychological injuries are severe, disabling, and long-lasting, requiring continued psychiatric care and therapy.

154. Plaintiff seeks compensatory damages for economic losses and emotional distress, declaratory relief, injunctive relief, back pay, front pay, reinstatement or front pay in lieu of reinstatement, pre-judgment and post-judgment interest, and reasonable attorneys' fees and costs.

**COUNT III — TITLE VII & SECTION 1981 RETALIATION (Against Ford Motor Company)**

155. Plaintiff incorporates all preceding paragraphs by reference.

156. Plaintiff engaged in protected activity under Title VII, including:

- Reporting sexual harassment by Sunil Archante to Domanique Rawls on December 13, 2024;
- Reporting sexual harassment by Sunil Archante to Tracy Carter on December 17, 2024;
- Reporting harassment and retaliation by Domanique Rawls through email to Tiffani Orange on June 3, 2025;
- Filing a formal complaint through Ford's QR code system on June 11, 2025;
- Reporting concerns to HR representative Dawn Gilmore on July 18, 2025;
- Filing formal written complaints with investigator Adrian on July 21 and July 29, 2025;
- Escalating complaints to Assistant Plant Manager Nicole Schrozez on August 21, 2025;
- Reporting retaliatory conduct through multiple channels throughout her employment;

- Opposing discriminatory practices in violation of Title VII.

157. Ford had actual knowledge of Plaintiff's protected activity.

158. Following Plaintiff's protected complaints, Ford subjected Plaintiff to materially adverse actions, including:

- Negative performance evaluations unsupported by objective evidence;
- Sabotage of work projects and denial of resources;
- Blocking transfer applications and fabricating grounds for denial;
- Escalating hostility, yelling, and disrespectful treatment;
- Removal from work communications and isolation;
- False accusations of threatening conduct;
- Suspension with pay;
- Termination of employment.

159. The adverse actions were causally connected to Plaintiff's protected complaints, as demonstrated by temporal proximity and the pretextual nature of Ford's stated reasons.

160. The adverse actions would dissuade a reasonable employee from making or supporting a charge of discrimination.

161. Ford's stated reasons for the adverse actions—performance issues and threatening conduct—were pretextual and fabricated to mask retaliation.

162. As a direct and proximate result of Ford's unlawful retaliation, Plaintiff has suffered and continues to suffer severe economic damages, including lost wages, lost employment benefits, lost career opportunities, and diminished earning capacity.

163. As a direct and proximate result of Ford's unlawful retaliation, Plaintiff has suffered and continues to suffer severe non-economic damages, including extreme emotional distress, mental anguish, anxiety disorder requiring ongoing medication and treatment, significant weight loss and physical deterioration, insomnia, humiliation, embarrassment, loss of dignity, damage to professional reputation, and loss of enjoyment of life. Plaintiff's emotional and psychological injuries are severe, disabling, and long-lasting, requiring continued psychiatric care and therapy.

164. Plaintiff seeks compensatory damages for economic losses and emotional distress, declaratory relief, injunctive relief, back pay, front pay, reinstatement or front pay in lieu of reinstatement, pre-judgment and post-judgment interest, and reasonable attorneys' fees and costs.

**COUNT IV — ADA DISABILITY DISCRIMINATION (Against Ford Motor Company)**

165. Plaintiff incorporates all preceding paragraphs by reference.

166. Plaintiff is an individual with a disability within the meaning of the Americans with Disabilities Act, having been diagnosed with anxiety disorder that substantially limits major life activities including sleeping, concentrating, interacting with others, and neurological and brain functions.

167. Alternatively, Plaintiff has a record of disability based on her diagnosed anxiety disorder and ongoing medical treatment.

168. Alternatively, Ford regarded Plaintiff as disabled based on her anxiety disorder, medical treatment, need for accommodations, weight loss, and stress-related symptoms.

169. Plaintiff was qualified to perform the essential functions of her position as Quality Engineer with or without reasonable accommodation.

170. Ford had actual knowledge of Plaintiff's disability through Plaintiff's disclosure and requests for accommodation.

171. Ford discriminated against Plaintiff because of her disability by:

- Subjecting her to heightened scrutiny and fabricated performance allegations following disclosure of disability;
- Denying transfer requests that would have accommodated her need to work away from the hostile environment causing her disability symptoms;
- Forcing her to continue working under the supervision of individuals whose harassment caused her disabling condition;
- Suspending and terminating her employment in connection with her disability.

172. Ford's stated reasons for adverse employment actions were pretextual and disability discrimination was a motivating factor.

173. Similarly situated employees without disabilities were treated more favorably.

174. As a direct and proximate result of Ford's unlawful disability discrimination, Plaintiff has suffered and continues to suffer severe economic damages, including lost wages, lost employment benefits, lost career opportunities, and diminished earning capacity.

175. As a direct and proximate result of Ford's unlawful disability discrimination, Plaintiff has suffered and continues to suffer severe non-economic damages, including extreme emotional distress, mental anguish, exacerbation of anxiety disorder symptoms requiring intensified medication and treatment, significant weight loss and physical deterioration, insomnia, humiliation, embarrassment, loss

of dignity, damage to professional reputation, and loss of enjoyment of life. Plaintiff's emotional and psychological injuries are severe, disabling, and long-lasting, requiring continued psychiatric care and therapy.

176. Plaintiff seeks compensatory damages for economic losses and emotional distress, declaratory relief, injunctive relief, back pay, front pay, reinstatement or front pay in lieu of reinstatement, pre-judgment and post-judgment interest, and reasonable attorneys' fees and costs.

**COUNT V — ADA FAILURE TO ACCOMMODATE (Against Ford Motor Company)**

177. Plaintiff incorporates all preceding paragraphs by reference.

178. Plaintiff is an individual with a disability within the meaning of the ADA.

179. Plaintiff notified Ford of her disability and requested reasonable accommodations, including transfer away from her harassing supervisor and modified work conditions to reduce stress and accommodate her anxiety disorder.

180. Plaintiff's requested accommodations were reasonable and would have enabled her to perform the essential functions of her position without imposing undue hardship on Ford.

181. Ford refused to provide reasonable accommodations and failed to engage in the interactive process required by the ADA.

182. Ford's failure to accommodate was not justified by business necessity or undue hardship.

183. Ford denied Plaintiff's accommodation requests in retaliation for disclosing her disability and requesting protected accommodations.

184. As a direct and proximate result of Ford's failure to accommodate, Plaintiff was unable to continue her employment and suffered termination.

185. As a direct and proximate result of Ford's unlawful failure to accommodate, Plaintiff has suffered and continues to suffer severe economic damages, including lost wages, lost employment benefits, lost career opportunities, and diminished earning capacity.

186. As a direct and proximate result of Ford's unlawful failure to accommodate, Plaintiff has suffered and continues to suffer severe non-economic damages, including extreme emotional distress, mental anguish, exacerbation of anxiety disorder symptoms requiring intensified medication and treatment, significant weight loss and physical deterioration, insomnia, humiliation, embarrassment, loss of dignity, damage to professional reputation, and loss of enjoyment of life. Plaintiff's emotional and psychological injuries are severe, disabling, and long-lasting, requiring continued psychiatric care and therapy.

187. Plaintiff seeks compensatory damages for economic losses and emotional distress, declaratory relief, injunctive relief, back pay, front pay, reinstatement or front pay in lieu of reinstatement, pre-judgment and post-judgment interest, and reasonable attorneys' fees and costs.

**COUNT VI — ADA RETALIATION (Against Ford Motor Company)**

188. Plaintiff incorporates all preceding paragraphs by reference.

189. Plaintiff engaged in protected activity under the ADA by disclosing her disability and requesting reasonable accommodations.

190. Ford subjected Plaintiff to adverse employment actions, including denial of accommodations, heightened scrutiny, fabricated performance allegations, denial of transfers, suspension, and termination.

191. The adverse actions were causally connected to Plaintiff's protected activity under the ADA, as demonstrated by temporal proximity and pretextual justifications.

192. Ford's stated reasons for the adverse actions were pretextual and designed to mask retaliation for disability-related protected activity.

193. As a direct and proximate result of Ford's unlawful retaliation, Plaintiff has suffered and continues to suffer severe economic damages, including lost wages, lost employment benefits, lost career opportunities, and diminished earning capacity.

194. As a direct and proximate result of Ford's unlawful retaliation, Plaintiff has suffered and continues to suffer severe non-economic damages, including extreme emotional distress, mental anguish, exacerbation of anxiety disorder symptoms requiring intensified medication and treatment, significant weight loss and physical deterioration, insomnia, humiliation, embarrassment, loss of dignity, damage to professional reputation, and loss of enjoyment of life. Plaintiff's emotional and psychological injuries are severe, disabling, and long-lasting, requiring continued psychiatric care and therapy.

195. Plaintiff seeks compensatory damages for economic losses and emotional distress, declaratory relief, injunctive relief, back pay, front pay, reinstatement or front pay in lieu of reinstatement, pre-judgment and post-judgment interest, and reasonable attorneys' fees and costs.

## COUNT VII — DEFAMATION (Against Ford Motor Company)

196. Plaintiff incorporates all preceding paragraphs by reference.

197. Ford, through its supervisory employees and agents acting within the scope of their employment, made false statements of fact about Plaintiff to third parties, including:

- That Plaintiff was engaged in inappropriate romantic or sexual relationships with co-workers;
- That Plaintiff exhibited "bad behavior" and "declining performance";
- That Plaintiff threatened violence against her supervisor;
- That Plaintiff violated workplace policies and engaged in misconduct.

198. Each of these statements was false.

199. Ford knew these statements were false or acted with reckless disregard for the truth.

200. Ford published these false statements to third parties within and outside Ford with actual malice, defined as knowledge of falsity or reckless disregard for truth, for the purpose of damaging Plaintiff's reputation and justifying unlawful termination.

201. The false statements were defamatory per se, imputing lack of professional integrity, commission of workplace misconduct, and violent propensity, and were injurious to Plaintiff's profession as an engineer.

202. The false statements were not subject to any privilege, or any applicable privilege was exceeded by malice.

203. Ford is vicariously liable for the defamatory statements made by its supervisory employees acting within the scope of employment.

204. Ford ratified the defamatory conduct by relying on the false statements as grounds for termination and failing to investigate, correct, or retract the statements.

205. As a direct and proximate result of Ford's defamatory statements, Plaintiff has suffered and continues to suffer severe economic damages, including lost wages, damage to professional reputation in the automotive engineering industry, difficulty obtaining subsequent employment, and diminished earning capacity.

206. As a direct and proximate result of Ford's defamatory statements, Plaintiff has suffered and continues to suffer severe non-economic damages, including extreme emotional distress, mental anguish, anxiety, humiliation, embarrassment, loss of dignity, damage to professional reputation and standing in the engineering community, loss of professional relationships, harm to personal reputation, and loss of enjoyment of life. Plaintiff's emotional and psychological injuries from the defamation are severe and ongoing.

207. Ford's defamatory conduct was willful, wanton, malicious, and undertaken with reckless disregard for Plaintiff's rights, warranting punitive damages to punish Ford and deter similar conduct.

208. Plaintiff seeks compensatory damages for economic losses and emotional distress, punitive damages, declaratory relief, injunctive relief requiring retraction of false statements, pre-judgment and post-judgment interest, and reasonable attorneys' fees and costs.

**COUNT VIII — VIOLATION OF ILLINOIS WHISTLEBLOWER ACT, 740 ILCS 174/1 *et seq.* (Against Ford Motor Company)**

209. Plaintiff incorporates all preceding paragraphs by reference.

210. The Illinois Whistleblower Act, 740 ILCS 174/1 *et seq.*, prohibits retaliation against employees who disclose information about suspected violations of state or federal laws, rules, or regulations.

211. Pursuant to the Illinois Whistleblower Act (740 ILCS 174/15 and 174/20), an employer may not retaliate against any employee for disclosing information to government agencies or management, or for refusing to participate in an activity in which the employee had "reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation."

212. The 2025 amendments to the Illinois Whistleblower Act expanded the definition of "retaliatory action" to include any action that would dissuade a reasonable worker from engaging in protected activity, increased available remedies to include liquidated damages, and provided for civil penalties up to $10,000 per violation.

213. Plaintiff reasonably believed and had an actual belief that the conduct of Domanique Rawls, Sunil Archante, Tiffani Orange, and other Ford supervisors violated several policies, rules, and legal statutes, including but not limited to Ford's corporate policies prohibiting sexual harassment and retaliation, Illinois Human Rights Act provisions, Title VII of the Civil Rights Act of 1964, and the Americans with Disabilities Act.

214. Plaintiff's reporting of supervisory misconduct falls squarely within the protected activities under the Illinois Whistleblower Act, as it involves disclosure of suspected violations of Ford's policies, state statutes and regulations, and federal regulations and statutes governing sexual harassment, discrimination, disability accommodations, and workplace retaliation based on actual and reasonable belief.

215. Plaintiff engaged in protected whistleblowing activity when she:

- Reported sexual harassment by Sunil Archante to supervisors Domanique Rawls and Tracy Carter in December 2024;
- Reported harassment, retaliation, and hostile work environment to Labor Relations Manager Tiffani Orange via email on June 3-4, 2025;
- Filed formal complaints through Ford's QR code reporting system on June 11, 2025, explicitly reporting violations of Ford's anti-retaliation policies;
- Escalated claims of hostile working environment, discrimination, harassment, and retaliation to multiple levels of management and HR between June and August 2025;
- Filed formal written complaints with plant investigator Adrian on July 21 and July 29, 2025, providing witness names and detailed allegations of policy violations;
- Reported ongoing misconduct to Assistant Plant Manager Nicole Schrozez on August 21, 2025;
- Disclosed her disability and requested accommodations in accordance with ADA requirements;
- Refused to participate in the cover-up of sexual harassment and retaliation by management.

216. Ford was aware of Plaintiff's whistleblowing activities through her direct reports to management, Labor Relations, Human Resources, and formal complaint systems.

217. Following Plaintiff's protected whistleblowing activities, Ford subjected Plaintiff to retaliatory actions including:

- Continued assignment under the supervision of her harasser despite requests for separation;
- Blocking of transfer applications to escape the hostile work environment;

- Fabrication of false performance allegations and claims of "bad behavior";
- Exclusion from work communications and professional opportunities;
- False accusations of threatening conduct;
- Suspension with pay based on unsubstantiated allegations;
- Termination of employment on September 8, 2025.

218. But for Plaintiff's protected whistleblowing activities, Ford would not have taken these adverse actions against her.

219. The temporal proximity between Plaintiff's protected activities and the adverse employment actions, combined with her history of excellent performance evaluations, lack of prior discipline, positive contemporaneous feedback from supervisors, and recognition by senior leadership for her Kaizen project work, demonstrates a clear causal connection between her whistleblowing activities and the retaliation she suffered.

220. Ford's retaliatory actions against Plaintiff violated Section 15(a) and (b) of the Illinois Whistleblower Act when they subjected her to adverse employment actions, created and maintained a hostile working environment, denied her reasonable accommodations and transfers, and ultimately terminated her employment in retaliation for her disclosure of violations of law and refusal to participate in unlawful conduct.

221. Ford's retaliatory actions would dissuade a reasonable employee from reporting violations of law, as demonstrated by Tiffani Orange's explicit instruction that Plaintiff should not use Ford's formal complaint system and her dismissal of Plaintiff's retaliation complaints.

222. As a direct and proximate result of Ford's violations of the Illinois Whistleblower Act, Plaintiff has suffered and continues to suffer severe economic damages, including lost wages, lost employment benefits, lost career opportunities, and diminished earning capacity.

223. As a direct and proximate result of Ford's violations of the Illinois Whistleblower Act, Plaintiff has suffered and continues to suffer severe non-economic damages, including extreme emotional distress, mental anguish, anxiety disorder requiring ongoing medication and treatment, significant weight loss and physical deterioration, insomnia, humiliation, embarrassment, loss of dignity, damage to professional reputation, and loss of enjoyment of life.

224. Pursuant to 740 ILCS 174/20(c) and (d), Plaintiff seeks compensatory damages, liquidated damages in an amount equal to the compensation to which Plaintiff is entitled, civil penalties, injunctive relief, reinstatement or front pay in lieu of reinstatement, pre-judgment and post-judgment interest, and reasonable attorneys' fees and costs.

## COUNT IX — RETALIATORY DISCHARGE IN VIOLATION OF ILLINOIS PUBLIC POLICY (Against Ford Motor Company)

225. Plaintiff incorporates all preceding paragraphs by reference.

226. Illinois recognizes a common law tort of retaliatory discharge when an employee is terminated in violation of a clearly mandated public policy.

227. The public policy of the State of Illinois, embodied in the Illinois Human Rights Act, Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, and the Illinois Whistleblower Act, prohibits retaliation against employees for

reporting unlawful conduct, opposing sexual harassment and discrimination, requesting disability accommodations, and exercising protected civil rights.

228. This public policy is clearly mandated, well-defined, and rooted in federal and state constitutional provisions, statutes, and administrative regulations designed to protect employees from unlawful employment practices.

229. Plaintiff engaged in protected activities that further clearly mandated public policies, including:

- Reporting sexual harassment by Quality Manager Sunil Archante and Process Engineering Manager Domanique Rawls;
- Opposing discriminatory and retaliatory conduct in violation of Title VII;
- Disclosing her disability and requesting reasonable accommodations under the ADA;
- Reporting violations of Ford's policies and federal anti-discrimination laws to management and through Ford's formal complaint systems;
- Refusing to participate in the cover-up of sexual harassment and retaliation by supervisors.

230. Ford terminated Plaintiff's employment on September 8, 2025, in direct retaliation for her engagement in these protected activities.

231. Ford's stated reasons for termination—performance issues, bad behavior, and threatening conduct—were pretextual and fabricated to conceal the true retaliatory motive.

232. The temporal proximity between Plaintiff's complaints and her termination, the lack of any prior disciplinary history, the fabricated nature of the allegations against

her, and Ford's failure to conduct a meaningful investigation of the threat allegation demonstrate that Plaintiff's termination was in retaliation for her protected activities.

233. Plaintiff had nineteen months of positive performance history with Ford, consistently received praise for her work, successfully completed high-visibility projects recognized by senior leadership, and had never been placed on a performance improvement plan or received formal discipline prior to her protected complaints.

234. Similarly situated employees who did not engage in protected activity were not subjected to suspension or termination based on unsubstantiated allegations.

235. Ford's termination of Plaintiff contravenes clearly mandated Illinois public policy protecting employees who oppose unlawful harassment, discrimination, and retaliation.

236. As a direct and proximate result of Ford's retaliatory discharge in violation of public policy, Plaintiff has suffered and continues to suffer severe economic damages, including lost wages, lost employment benefits, lost career opportunities, and diminished earning capacity.

237. As a direct and proximate result of Ford's retaliatory discharge in violation of public policy, Plaintiff has suffered and continues to suffer severe non-economic damages, including extreme emotional distress, mental anguish, anxiety disorder requiring ongoing medication and treatment, significant weight loss and physical deterioration, insomnia, humiliation, embarrassment, loss of dignity, damage to professional reputation, and loss of enjoyment of life.

238. Ford's retaliatory discharge was willful, wanton, and undertaken with reckless disregard for Plaintiff's protected rights, warranting punitive damages to punish Ford and deter similar conduct.

239. Plaintiff seeks compensatory damages for economic losses and emotional distress, punitive damages, pre-judgment and post-judgment interest, and reasonable attorneys' fees and costs.

**COUNT X — NEGLIGENT SUPERVISION (Against Ford Motor Company)**

240. Plaintiff incorporates all preceding paragraphs by reference.

241. Under Illinois law, employers have a duty to act reasonably in supervising their employees to prevent harm to third persons, including other employees.

242. To establish negligent supervision, Plaintiff must demonstrate: (1) Ford knew or should have known that Domanique Rawls and other supervisors had a particular unfitness for their supervisory positions so as to create a danger of harm to subordinate employees; (2) such particular unfitness was known or should have been known at the time of Ford's retention or failure to supervise; and (3) this particular unfitness proximately caused Plaintiff's injury.

243. Ford knew or should have known of Domanique Rawls' particular unfitness for her supervisory position based on specific characteristics, conduct, and dangerous propensities, including:

- Making unwelcome sexual and romantic advances toward female subordinates under her direct supervision;
- Engaging in persistent boundary violations with subordinates, including requests for personal favors such as childcare and real estate transaction assistance;

- Demonstrating jealous, possessive, and controlling behavior toward subordinates who rejected her advances, including tracking their relationships and expressing anger when subordinates praised other supervisors;
- Explicitly threatening to terminate employees who rejected her advances or received recognition from senior leadership;
- Retaliating against subordinates through sabotage of work projects, fabrication of false performance allegations, blocking of transfer opportunities, and coordination with other managers to build pretextual termination cases;
- Creating and maintaining hostile work environments through yelling at employees, excluding them from work communications, and isolating them from professional opportunities;
- Abusing her supervisory authority by filing false allegations of threatening conduct against subordinates who reported her misconduct.

244. Ford had actual knowledge of Domanique Rawls' particular unfitness through multiple specific reports and observable conduct, including:

- Plaintiff's December 13, 2024 report to Domanique Rawls of sexual harassment by Sunil Archante, which Domanique dismissed rather than addressing;
- Plaintiff's email to Tiffani Orange on June 3, 2025, documenting Domanique's disrespectful treatment of Plaintiff in front of other employees;
- Plaintiff's formal complaint through Ford's QR code system on June 11, 2025, explicitly reporting retaliation by Domanique Rawls;
- Plaintiff's statement to Tracy Carter at the end of June 2025 that Tiffani Orange and Domanique Rawls were working together to retaliate against her;

- Plaintiff's email to HR representative Dawn Gilmore on July 18, 2025, stating she did not feel comfortable having one-on-one meetings with Domanique due to ongoing harassment and retaliation;
- Plaintiff's formal written complaints to investigator Adrian on July 21 and July 29, 2025, detailing Domanique's harassment, bullying, and provision of witness names including Costed Foy, Debbie Courtsee, Osama Bureem, and Dan Lacy;
- Plaintiff's escalation to Assistant Plant Manager Nicole Schrozez on August 21, 2025, regarding ongoing harassment and retaliation;
- Observable conduct witnessed by other employees, including Domanique's public yelling at Plaintiff on June 3, 2025, in the presence of Debbie Courtsee and others;
- Domanique's removal of Plaintiff from the Chassis work group text thread on August 21, 2025, in retaliation for Plaintiff praising another supervisor, documented in Plaintiff's email to Tracy Carter.

245. On information and belief, Ford had prior knowledge of Domanique Rawls' propensity for inappropriate conduct with subordinates through complaints from other employees predating Plaintiff's employment, which Ford failed to investigate or address adequately.

246. Ford knew or should have known of Sunil Archante's particular unfitness for his supervisory position based on his December 12, 2024 sexually explicit text message to Plaintiff stating "I wish I can lay underneath you," which Plaintiff immediately reported to management on December 13 and December 17, 2024.

247. Ford failed to take reasonable steps to supervise Domanique Rawls and Sunil Archante despite knowledge of their particular unfitness, including:

- Failing to remove Domanique from supervisory authority over Plaintiff after receiving multiple reports of harassment and retaliation;
- Failing to discipline Domanique for making unwelcome sexual advances toward a subordinate;
- Failing to investigate Plaintiff's sexual harassment complaint against Sunil Archante or impose any consequences;
- Allowing Tiffani Orange to dismiss Plaintiff's formal retaliation complaint and instruct Plaintiff not to use Ford's reporting system, thereby protecting Domanique from accountability;
- Failing to separate Plaintiff from Domanique's supervision despite Plaintiff's explicit requests and medical documentation that the hostile environment was causing disabling anxiety;
- Allowing Domanique to block Plaintiff's transfer applications without objective justification;
- Failing to investigate the corroboration available from multiple witnesses identified by Plaintiff;
- Crediting Domanique's false allegation that Plaintiff threatened her without interviewing witnesses or reviewing Conference Room 103 security footage;
- Allowing coordination between Domanique, Tiffani Orange, Jennifer Mayfield, Calvin Washington, and Staci Washington to build a pretextual termination case against Plaintiff.

248. Ford's negligent supervision was a proximate cause of Plaintiff's injuries, as Ford's failure to supervise Domanique Rawls and Sunil Archante allowed the sexual

harassment, retaliation, hostile work environment, and ultimate wrongful termination to occur.

249. Had Ford taken appropriate supervisory action after receiving notice of Domanique Rawls' and Sunil Archante's particular unfitness—including removal from supervisory roles, discipline, mandatory training, reassignment of Plaintiff, or termination—Plaintiff would not have suffered the ongoing harassment, retaliation, disability discrimination, and wrongful termination that resulted from Ford's failure to supervise.

250. It was reasonably foreseeable that Ford's failure to supervise Domanique Rawls, given her demonstrated propensities for sexual harassment, retaliation, and abuse of authority, would result in harm to subordinate employees, including sexual harassment, hostile work environment, fabricated performance allegations, blocked career opportunities, and retaliatory termination.

251. As a direct and proximate result of Ford's negligent supervision, Plaintiff has suffered and continues to suffer severe economic damages, including lost wages, lost employment benefits, lost career opportunities, and diminished earning capacity.

252. As a direct and proximate result of Ford's negligent supervision, Plaintiff has suffered and continues to suffer severe non-economic damages, including extreme emotional distress, mental anguish, anxiety disorder requiring ongoing medication and treatment, significant weight loss and physical deterioration, insomnia, humiliation, embarrassment, loss of dignity, damage to professional reputation, and loss of enjoyment of life.

253. Plaintiff seeks compensatory damages for economic losses and emotional distress, pre-judgment and post-judgment interest, and reasonable attorneys' fees and costs.

**COUNT XI — NEGLIGENT RETENTION (Against Ford Motor Company)**

254. Plaintiff incorporates all preceding paragraphs by reference.

255. Under Illinois law, employers have a duty to act reasonably in retaining employees and have a duty not to retain employees who the employer knows or should know pose a danger of harm to others.

256. Negligent retention is established when: (1) the defendant-employer knew or should have known that an employee had a particular unfitness for the position so as to create a danger of harm to third persons; (2) such particular unfitness was known or should have been known at the time of retention; and (3) this particular unfitness proximately caused the plaintiff's injury.

257. Ford knew or should have known of Domanique Rawls' particular unfitness to remain in her position as Process Engineering Manager based on the specific characteristics and dangerous propensities alleged in paragraphs 243-246 above, which demonstrated that she posed a danger of harm to subordinate employees under her supervision.

258. Ford had actual or constructive knowledge of Domanique Rawls' particular unfitness at the time Ford retained her in her supervisory position following Plaintiff's multiple complaints between December 2024 and August 2025, as detailed in paragraph 244 above.

259. On information and belief, Ford had knowledge of Domanique Rawls' propensity for harassment and retaliation from complaints by other employees prior

to Plaintiff's employment, yet Ford continued to retain Domanique in a supervisory position with authority over subordinate employees.

260. Despite knowledge of Domanique Rawls' particular unfitness—including making unwelcome sexual advances toward subordinates, engaging in retaliatory conduct, threatening to terminate employees, fabricating performance issues, and abusing supervisory authority—Ford made the conscious decision to retain Domanique in her supervisory role rather than terminate her employment or remove her from positions of authority over subordinates.

261. Ford knew or should have known of Sunil Archante's particular unfitness to remain in his position as Quality Manager after Plaintiff reported his sexually explicit text message on December 13 and December 17, 2024, yet Ford retained Sunil in his supervisory position without investigation, discipline, or corrective action.

262. Ford's retention of Domanique Rawls and Sunil Archante in supervisory positions after receiving specific notice of their particular unfitness created a foreseeable danger of harm to Plaintiff and other subordinate employees.

263. Ford's negligent retention of Domanique Rawls and Sunil Archante was a proximate cause of Plaintiff's injuries, as their continued employment in supervisory positions allowed them to perpetrate ongoing sexual harassment, retaliation, hostile work environment, fabrication of false allegations, and coordination to terminate Plaintiff's employment.

264. Had Ford terminated Domanique Rawls' and Sunil Archante's employment or removed them from supervisory positions after receiving notice of their particular unfitness and dangerous propensities, Plaintiff would not have suffered the

escalating harassment, retaliation, disability discrimination, defamation, and wrongful termination that proximately resulted from Ford's negligent retention.

265. It was reasonably foreseeable at the time Ford retained Domanique Rawls and Sunil Archante in their positions that their demonstrated propensities for sexual harassment, retaliation, and abuse of authority would cause harm to subordinate employees, including continued harassment, hostile work environment, fabricated disciplinary action, and retaliatory termination.

266. As a direct and proximate result of Ford's negligent retention, Plaintiff has suffered and continues to suffer severe economic damages, including lost wages, lost employment benefits, lost career opportunities, and diminished earning capacity.

267. As a direct and proximate result of Ford's negligent retention, Plaintiff has suffered and continues to suffer severe non-economic damages, including extreme emotional distress, mental anguish, anxiety disorder requiring ongoing medication and treatment, significant weight loss and physical deterioration, insomnia, humiliation, embarrassment, loss of dignity, damage to professional reputation, and loss of enjoyment of life.

268. Plaintiff seeks compensatory damages for economic losses and emotional distress, pre-judgment and post-judgment interest, and reasonable attorneys' fees and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Ayanna A. Lynn respectfully requests that this Court enter judgment in her favor and against Defendant Ford Motor Company, and grant the following relief:

A. Compensatory damages for lost wages, lost employment benefits, lost career opportunities, and other economic losses in an amount to be determined at trial;

B. Compensatory damages for emotional distress, mental anguish, anxiety disorder, physical harm, weight loss, insomnia, humiliation, embarrassment, loss of dignity, damage to reputation, and other non-economic losses in an amount to be determined at trial;

C. Punitive damages in an amount sufficient to punish Defendant for its willful, malicious, and reckless conduct and to deter similar conduct in the future;

D. Liquidated damages pursuant to the Illinois Whistleblower Act, 740 ILCS 174/20(c);

E. Civil penalties pursuant to the Illinois Whistleblower Act, 740 ILCS 174/20(d);

F. Declaratory relief declaring that Defendant's conduct violated Title VII of the Civil Rights Act of 1964, as amended, the Americans with Disabilities Act of 1990, as amended, the Illinois Whistleblower Act, and clearly mandated public policy of the State of Illinois;

G. Injunctive relief requiring Defendant to:

(i) Expunge all false and defamatory statements from Plaintiff's personnel file;

(ii) Issue a retraction of false statements made about Plaintiff;

(iii) Implement effective policies and training to prevent sexual harassment, retaliation, and disability discrimination;

(iv) Discipline supervisory personnel who engaged in unlawful conduct;

H. Reinstatement to Plaintiff's former position or front pay in lieu of reinstatement;

I. Back pay from the date of termination through the date of judgment or reinstatement, with prejudgment interest;

J. Pre-judgment and post-judgment interest at the highest lawful rate;

K. Reasonable attorneys' fees and costs incurred in prosecuting this action;

L. Such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

**DATE: March 20, 2026**

Respectfully submitted,

/s/ Chiquita Hall-Jackson

Chiquita Hall-Jackson, Esq.

Chiquita Hall-Jackson-6312976
Attorney for Plaintiff
Hall-Jackson & Associates, P.C.
180 W. Washington St., Suite 820
Chicago, IL 60602
312-255-7105